Harold Lloyd Murphy, SENIOR UNITED STATES DISTRICT JUDGE
This case is before the Court on the Motion to Exclude Testimony of Defendants' Retained Expert Bruce Penn Regarding the Subject Property's After-Take Value ("Motion to Exclude") filed by Plaintiff United States of America, upon the relation and for the use of the Tennessee Valley Authority (the "TVA") ("Plaintiff") [44].
I. Background
A. Procedural Background
On November 17, 2017, Plaintiff filed a Motion to Exclude relating to Defendants' expert, Bruce Penn. (Mot. Exclude (Docket Entry No. 44).) The briefing process for that Motion is complete, and the Court finds that the matter is ripe for resolution.
B. Materials Submitted by the Parties
1. Revised Appraisal Report
Plaintiff submitted Mr. Penn's revised appraisal report. (Revised Appraisal Report of Bruce R. Penn (Docket Entry No. 44-3).) Mr. Penn opined that the market value of the rights acquired in the Subject Property, plus consequential damages, was $10,300, with the Subject Property being worth $22,000 before the acquisition and $11,700 afterward. (Id. Cover Page and i (internal page numbers used).) Mr. Penn stated: "The reported analyses, opinions and conclusions were developed and this report has been prepared in conformity *1335 with the requirements of the Code of Professional Ethics and the Uniform Standards of Professional Appraisal Practice." (Id. at 1.) Mr. Penn noted that, implicit in the definition of market value is that the sale took place under circumstances in which, among other things, "[b]oth parties are well informed or well advised, and both are acting in what they consider to be their own best interest." (Id. at 7.) Mr. Penn stated:
Analysis of Diminished Value In determining the impact, if any, from the acquisition and the monetary award due the owner from the acquisition, the appraiser utilized sales of land with high voltage transmission lines in Gordon County over the past twenty five years. These sales were analyzed using a paired data technique. Statistical application of the entirety of the data over 25 years was not considered a viable measurement due to the number of years of the economic crash and the elimination of market elasticity which would yield reliable results.
(Id. at 8.) Mr. Penn used the "Market Data/Direct Sales Comparison Approach" in his appraisal. (Id. at 24.) Mr. Penn examined recent sales of similar properties in the area, and opined "that the market value of the [S]ubject [P]roperty before the acquisition is $15,000 per acre," resulting in a pre-taking value of $22,000 for the 1.41 acre tract. (Id. at 25.) With respect to the after-acquisition valuation, Mr. Penn stated:
The acquisition considers the right to trim trees outside of the delineated easement for construction of a high voltage transmission line. As the poles and towers are in the center of the transmission line easement, the distance from the poles and towers to the edge of the easement would be 75 feet. The tree trimming easement considers trees that may fall within 10 feet of the poles and towers. Trees do not grow higher than 70 or 75 feet, and typically no higher than 50 feet. Based on these parameters, the easement is excessive.
Additionally, the acquisition by the TVA does not consider the fall radius of the poles or towers. The poles or towers are approximately 125 feet tall. If one of the poles or towers were to fall perpendicular to the easement, the poles or towers would fall onto the [S]ubject [P]roperty.
Finally, the proximity of the high voltage transmission line easement is close to the [S]ubject [P]roperty requiring the tree trimming rights/easement, a prospective purchaser would consider the subject to be a part of the high voltage transmission line easement. A prospective buyer would not delineate between the rights acquired and the easement. A prospective buyer would consider the entire easement including the tree trimming rights in his/her purchase decision of the property.
In evaluating the probable value of the [S]ubject [P]roperty after the acquisition, the appraiser considered the May 1, 2017 sale of a portion of TVA Parcel No CPFL-90-CR. This is a 41.54 acres of land improved with four poultry houses and ancillary buildings. The 41.54 acres is comprised of three parcels containing 1 acre, 20.54 acres, and 20 acres. Of these parcels, the 20 acre tract was encumbered by the tree trimming rights to TVA.
During negotiations, the personalty (chicken houses and mobile home) was negotiated separately from the land. The negotiated and agreed upon sale price of the land was $7,000 per acre.
The owner of Parcel CPFL-90-CR did not sell the entire parcel, but rather only 21.54 acres away from the parcel with the tree trimming rights. The southern 20 acres, which includes the tree trimming rights. However, the purchaser *1336 was not willing to purchase the back 20 acres for the same $7,000 per acre, citing the tree trimming easement as the main consideration. The purchaser indicated he would not pay more than $4,000 per acre for the remaining 20 acres with the tree trimming easement.
A comparison of the negotiated sale price of $7,000 per acre and the offer to pay no more than $4,000 per acre for the tract with the tree trimming easement indicates a reduction in value of -43%.
The appraiser also considered numerous paired data analyses performed by the appraiser over the years. These studies support the reduction in value of around 45% to the subject for the rights being acquired.
Based on this analysis, it is the opinion of this appraiser that the market value of the [S]ubject [P]roperty after the acquisition is $8,250 per acre.
(Id. at 26-27 (emphasis in original).)
2. Deposition Excerpts
Plaintiff presented excerpts from Mr. Penn's deposition. (Dep. of Bruce R. Penn (Docket Entry Nos. 44-4, 48-2).) Mr. Penn testified that USPAP is generally recognized within the appraisal profession as establishing the standards for professional appraisers and as reliable authority for appraisers to use in forming valuation opinions. (Id. at 12-13.) Mr. Penn stated that he relied on the land residual analysis from his initial report in forming his opinions in the supplemental report. (Id. at 24.) According to Mr. Penn, with respect to the land residual analysis, "it's not solely, and it's not primarily, but I did rely on it." (Id. at 25.) Mr. Penn noted:
I've done a number of studies, and a lot of the articles and treatises that are presented typically take place in developed subdivisions....
But there are a couple of instances in my studies where a vacant lot was looked at. And in those cases, the damage seems-or the reduction in value seem[s] to come up at about 40 or 50 percent. Using the land residual analysis, it would be much greater. But at some point in time you have to use what the market shows you as opposed to a residual type analysis.
So in this case, I actually have performed studies that show 40, 45 percent. The land residual would bring me something, greater, but really and truly 40 to 45 percent is what I applied here.
(Id. at 25-26.) Mr. Penn explained:
[B]asically, it's my studies. 40 to 45 percent on a vacant lot is historically what I've seen.
Because we're only dealing with a single lot, not a multiple-you know, not a developer-minded kind of seller and buyer, then the single lot took the heaviest weight in terms of the concept and the methodology. My experience is 40, 45 percent, 50 percent.
So the land residual analysis, what I considered was given the least amount of weight, but it did support the 40, 45 percent.
(Id. at 26-27.)
With respect to the statement that the easement is excessive, Mr. Penn testified:
Excessive-this particular paragraph talks about the fact that if the easement is so wide and the structure is dead center in between, that I don't want to say it's impossible because, you know, nothing is ever absolutely impossible.
It's extremely rare that a tree would grow so tall as to fall forward and hit the pole or hit one of the wires because the pole is sitting 95 to 125 feet tall. Trees don't grow in Georgia past about 70. So even if it tips over and you've got the-what? 50 feet, 75 feet on that side. It won't hit.
*1337 So a layperson would sit there and think it's a little excessive, especially when you consider that the structure itself isn't even on my property, and yet you're coming onto mine to buy rights. Some people would think that's-I don't want to say excessive. Perhaps intrusive may be a better word to a potential buyer.
(Id. at 27-28.) Mr. Penn explained: "I'm looking at it through the eyes of a prospective buyer and numerous property owners that I've talked to throughout my career in working with these types of cases and what they might expect or what they anticipate when they see something like that." (Id. at 28.) With respect to whether the prospective buyer was well-informed as to the encumbrance, Mr. Penn noted:
[A] buyer is not sophisticated enough. They know TVA owns rights on this property. They look on the property and they see the line, the power line-the transmission line rather, any structures that are in the area, and they will assume it's all-inclusive, if that makes sense. They will see the power line as being a part of their property. Whether real or perceived, that's what a property owner would see.
Q. So the buyer is not-the prospective buyer is not well-informed or well-advised as to the property rights that are encumbered on the subject tract? That's part of your assumption; correct?
A. I don't know that I'd say it exactly that way, but it's close enough. I'll agree to it.
Q. Well, if you want to qualify it, tell me. I want it in your words. You're assuming that the prospective buyer isn't well-informed as to the property rights that are encumbering the subject tract?
A. They are seeing the rights being encumbered-no, they're not. They're really not. They take a look and they see that TVA owns property-owns rights on their property. And they look and they see a power line. And they say, well, it must be all part of the transmission line easement.
I don't think a typical buyer distinguishes the difference between tree rights and transmission easement. They see it all as one thing....
(Id. at 29-30.)
As for the possibility of the structure falling, Mr. Penn acknowledged that none of the poles being constructed are on the subject tract and that the transmission line right-of-way was not on the subject tract. (Penn Dep. at 31.) The following exchange occurred:
Q. And so this paragraph two is talking about 125-foot towers. And so how does the presence of a tower on an adjacent tract impact the value with respect to it potentially falling?
A. A lot of buyers I have seen, especially-and this happened-this came up primarily over in east Georgia around Waynesboro and Thomson where the buyers actually consider-again, they weren't sophisticated enough to split hairs over the easement, but they were concerned about where the tower would fall if it were to fall over to one side or another.
And in this case, I think the tower's tall enough that it would fall outside of the transmission line easement into our property. Again, that goes back to what a potential buyer would look at and see as part of the easement area itself.
Q. So is the concern the prospective future damage to the subject tract arising from the tower sometime in the future falling onto the subject tract?
A. It is a consideration. Whether real or perceived, whether strong or minute, it is a consideration for a potential buyer.
*1338 Q. Well, I'm looking at your language, and I'm parsing it out.
So on Hobgood/Duckworth 123, you say, "Additionally, the acquisition by the TVA does not consider the fall radius of the poles or towers."
A. Yes, sir.
Q. And, again, I'm trying to understand how the fall radius of the poles or towers constructed on an adjacent property impact the value of the subject tract.
A. Because if it were to fall towards us, it would fall on our property.
(Id. at 31-32.) Mr. Penn also opined that prospective buyers would not make a distinction between the towers and right of way on the adjacent tract and the clearing rights on the Subject Property. (Id. at 33.)
Mr. Penn noted that an unaccepted offer for the other parcel "established that the market is sensitive to tree-trimming rights even though there is no easement itself on the property, and it supported [his] opinion of 45 percent." (Penn Dep. at 33.)
With respect to his paired data analysis, Mr. Penn noted that his analysis "more conforms with the trend analysis," but described his analysis as a "[p]aired data analysis." (Penn Dep. at 44-45.) Mr. Penn, however, stated that his analysis number one was a trend analysis, as particularly defined by the Appraisal Institute. (Id. at 45.) Mr. Penn could not identify a property in the paired data analysis that only had a clearing rights easement. (Id. at 48-49.) Mr. Penn also could not recall ever having done a paired data analysis involving a control property with only a clearing rights easement. (Id. at 49.) All of the control properties in Mr. Penn's multi-subdivision analyses had transmission lines easements and rights-of-way. (Id. at 50-51.)
3. Property Taken
a. The Subject Property
Defendants filed a copy of the description of the taking for the Subject Property. (Docket Entry No. 47-2.) That document provided, in relevant part:
Tree-removal rights with respect to land located in Land Lot 246, the Fourteenth District, Third Section of Gordon County, State of Georgia, and described in a deed recorded at Deed Book 626, page 61, in the office of the Superior Court Clerk of Gordon County, Georgia, which description is incorporated herein by reference and made a part hereof. Said rights consisting of the perpetual right to remove, cut down, destroy, and/or otherwise dispose of any trees which in falling could come within ten feet of any transmission line structure or conductor (including structures and conductors being on and over adjacent land), the Tennessee Valley Authority (TVA) to remain liable for any direct physical damage to said land and fences thereon resulting from operations by and on behalf of the TVA in the exercise of said rights.
TRACT NO. CPFL-96-CR
The perpetual right to enter at any time and from time to time the east portion of the land of James W. Hobgood, et al., and trim, top, cut, clear, and remove, destroy, or otherwise dispose of as necessary any trees, which in falling could come within ten (10) feet of any transmission line structure or conductor on the Center Point-Moss Lake # 2 Transmission Line ....
(Id. )
b. The Veach Property
Plaintiff filed a copy of the grant of transmission line easement for the neighboring property owned by Gregory W.
*1339 Veach (the "Veach Property"). (Grant of Transmission Line Easement (Docket Entry No. 48-1).) That document provided, in relevant part, that Mr. Veach, as the undersigned:
have this day bargained and sold, and by these presents do hereby grant, bargain, sell, transfer, and convey unto the UNITED STATES OF AMERICA a permanent easement and right-of-way for the following purposes, namely: the perpetual right to enter at any time and from time to time and to erect, maintain, repair, rebuild, operate, and patrol lines of transmission line structures with wires and cables for electric power circuits and communication circuits and all necessary appurtenances; to clear said right-of-way and keep it clear of all trees, brush, buildings, signboards, billboards, stored personal property, and fire hazards; to destroy or otherwise dispose of such trees and brush; to prevent the drilling or sinking of wells within the right-of-way; and to remove, destroy, or otherwise dispose of any trees located beyond the limits of the right-of-way which in falling could come within ten (10) feet of any transmission line structure or conductor; all over, upon, across, and under the land described in Exhibit A hereto attached and by this reference hereby incorporated in and made a part of this instrument as fully as if here written.
(Id. at 1.) The easement was further described as: "A permanent easement for transmission line purposes on, over, and across a parcel of land located in Land Lots 246 and 259 in the Fourteenth District, Third Section of Gordon County, State of Georgia, as shown on sheet P4 of US-TVA drawing LW-8963, Revision 1 ...." (Id. at 3.) Further, "said permanent easement rights include the perpetual right to install, maintain, and replace guy wires and necessary appurtenances outside the right-of-way for the transmission line structure located at survey station 843+69.70." (Id. )
4. Mr. Penn's Qualifications
Defendants also filed a copy of Mr. Penn's qualifications. (Docket Entry No. 47-3.)
5. Comparable Land Sales and Paired Data Analyses
Defendants filed a copy of Mr. Penn's comparable land sales and paired data analyses. (Docket Entry No. 47-4.)
II. Discussion
A. The Parties' Positions
1. Plaintiff's Motion
Plaintiff notes that it simply seeks to acquire tree-removal rights in this action. (Br. Supp. Mot. Exclude (Docket Entry No. 44-1) at 1.) According to Plaintiff, "the impact of the taking on Defendants' use of their land is a restraint on their right to grow trees to heights that have the potential to fall onto or cause damage to a transmission line built wholly within the Government's right-of-way on the neighboring property." (Id. at 1-2.) Plaintiff argues that "Defendants seek to recover damages for alleged diminution in the value of their property based on the presence of the transmission line on the neighboring property." (Id. at 2.) Plaintiff, however, contends "that just compensation in a federal condemnation proceeding does not include any diminution in value caused by the Government's use of adjoining lands for the same undertaking." (Id. (citation omitted); see also id. at 2-6.) According to Plaintiff, "Defendants seek to recover damages to their property allegedly caused by the construction of transmission lines on their neighbor's property," and, "[b]y seeking to proffer Mr. Penn's opinion in support of these legally non-cognizable damages, Defendants seek to use Mr. *1340 Penn's opinion to usurp the role of this Court in applying federal law precluding any such damages award." (Id. at 6.)
Plaintiff points out that, in 2016, it acquired an easement and right-of-way across the Veach Property, which is a neighboring tract of land. (Br. Supp. Mot. Exclude at 6.) In 2017, TVA erected a transmission structure and transmission lines wholly within the easement on the Veach Property. (Id. ) In the instant action, Plaintiff "acquired tree-clearing rights on Defendants' property for purposes of protecting the transmission structure and lines built entirely within its right-of-way on the Veach [P]roperty." (Id. ) Plaintiff notes that it "did not acquire the right to construct a transmission line on the [Subject Property], and it has not done so." (Id. at 7.) Plaintiff points out that the edge of the right-of-way over the Veach Property "is approximately 15 feet south from, and parallel to, the border of the [S]ubject [P]roperty and the Veach [P]roperty." (Id. ) According to Plaintiff, in the instant action, it "acquired the right to clear trees on the [S]ubject [P]roperty that have the potential to fall onto or cause damage to TVA's transmission line built within the Government's right-of-way on the adjacent Veach [P]roperty." (Id. at 8.) Plaintiff points out that "[t]he sole remaining issue in this proceeding is the amount of just compensation [Defendants] are entitled to receive for the Government's taking of tree-clearing rights on the [S]ubject [P]roperty." (Id. )
Plaintiff notes that Mr. Penn, in a revised report, opined that the Subject Property's pre-take value was $22,000 and that "the governmental taking of clearing rights diminished the [S]ubject [P]roperty's value by 47%, resulting in an after-take value of $11,700." (Br. Supp. Mot. Exclude at 9.) According to Plaintiff:
Mr. Penn considered five factors in forming his revised opinion of the [S]ubject [P]roperty's "after-take" value: (1) the excessiveness of the easement taken; (2) that towers erected on the Veach [P]roperty have the potential to fall onto and damage the [S]ubject [P]roperty; (3) an assumption that prospective buyers would not be able to delineate clearing rights that encumber the [S]ubject [P]roperty from the transmission line easement that encumbers the Veach [P]roperty; (4) a purported offer to purchase a different property that the seller did not accept; and [ ] (5) market studies in which all of the control properties were encumbered by transmission line easements and none of the control properties were encumbered by a clearing rights easement.
(Id. at 9-10 (citation and footnote omitted).) Importantly, Plaintiff notes that it "does not contend that Mr. Penn's opinion regarding the [S]ubject [P]roperty's pre-take value is inadmissible." (Id. at 12.)
Plaintiff argues that the Court should exclude Mr. Penn's "after-take" valuation opinions "because (1) his valuation opinion includes damages that are not legally cognizable in federal condemnation proceedings; (2) his valuation opinion does not properly apply methodologies generally accepted within the appraisal profession; and (3) because there is too great an analytical gap between the data and his proffered opinions." (Br. Supp. Mot. Exclude at 12-13.)
Plaintiff notes that Mr. Penn's opinion concerning the "excessiveness" of the taking is Mr. Penn's own "personal opinion that it is unlikely that any tree on the [S]ubject [P]roperty would ever grow to a sufficient height such that were the tree to fall towards the adjacent Veach [P]roperty, it could cause damage to transmission lines on the Veach [P]roperty." (Br. Supp. Mot. Exclude at 13 (emphasis in original).) Plaintiff argues that Mr. Penn "is not an *1341 expert in forestry, vegetation management, or transmission line engineering, and his lay opinion as to assured clearance distances needed to maintain the safety of TVA transmission lines on the Veach [P]roperty is not admissible because Mr. Penn is not qualified to render such opinions and was not disclosed as an expert qualified to render opinions in those areas." (Id. at 14.) Plaintiff further contends that "Mr. Penn's consideration of this factor is not relevant to damages that may be awarded in this federal condemnation proceeding," as the opinion is not "based on the change in value arising from property rights actually taken," but instead is "based on his opinion as to the property rights that the Government should have taken." (Id. ) Plaintiff also takes issue with the logic behind assigning weight to this factor, noting that, if it is unlikely that the trees would "grow to a height that would allow the Government to exercise its tree-clearing rights, the value of the right to cut such trees would have no value." (Id. at 15.)
With respect to the second factor, the potential damage caused by a tower on the Veach Property falling onto the Subject Property, Plaintiff notes that there is no actual tower on the Veach Property, which instead has only a two-pole structure. (Br. Supp. Mot. Exclude at 15 n.7.) According to Plaintiff, this factor "again seeks to award the landowner just compensation for damages that are not recoverable in a condemnation action governed by federal law." (Id. at 16 (footnote omitted).) Plaintiff notes that, even if this event occurred in the future, the landowner could assert a claim for damage when that event occurred. (Id. at 16-17.)
Plaintiff also argues that Mr. Penn's opinion that prospective buyers may not be able to distinguish between clearing rights on the Subject Property and the easement and right-of-way on the Veach Property is contrary to appraisal standards concerning market value, which assume that a buyer is well-informed, as well as contrary to Mr. Penn's own methodology. (Br. Supp. Mot. Exclude at 17-19.) Plaintiff further argues that, with this factor, "Mr. Penn again opines that [Defendants] are entitled to compensation for the presence of transmission lines on an adjoining property," and contends that this opinion is not relevant. (Id. at 19.)
With respect to the purported offer made to Defendant Pamela Duckworth for another of her properties, Plaintiff notes that a mere unaccepted offer to buy or sell is not admissible to establish market value. (Br. Supp. Mot. Exclude at 19-20.)
Finally, Plaintiff argues that the control properties that Mr. Penn used in his trend analysis are not valid comparators because all of those properties involve transmission line easements, not tree-clearing easements. (Br. Supp. Mot. Exclude at 20-23.) According to Plaintiff, "by seeking to use studies of properties encumbered by transmission lines to value a property that is not encumbered by a power line, Mr. Penn seeks to use his studies to suggest that Defendants can recover impermissible damages due to the presence of a power line on an adjoining property." (Id. at 23.)
2. Defendants' Response
In response, Defendants argue that "the real problem in this matter is not how Mr. Penn went through the appraisal process," but instead "is what Mr. Penn was given to appraise." (Resp. Mot. Exclude (Docket Entry No. 47) at 4 (emphasis in original).) Defendants complain that Plaintiff did not initially condemn in the easement "sufficient peripheral lands for access, maintenance and protection of the power lines." (Id. ) According to Defendants, Plaintiff "manipulatively did nothing more than re-label the taking on the Subject Property as 'tree-removal rights,' " which "was nothing *1342 more than a new name without any significantly separate or distinct function." (Id. at 5.) Defendants argue that "the 'tree-removal rights' are indefinitely described in the legal description, to the extent that the methods of ingress, egress, and other access over the property are unknown, the frequency of the uses on the property are unknown, and all other manner of use is unknown, not just for some limited area, but for the entire residential lot." (Id. ) Defendants contend that "Mr. Penn performed his task in the most reasonable manner possible under these circumstances, giving primary consideration to the property based upon the easement rights taken that would undoubtedly reduce its value, but also giving some minor degree of consideration to the possibility that the taking is, in sum and substance, an actual part of the actual power line easement." (Id. )
Defendants agree that federal law governs just compensation, which "is restricted to the land taken, and to damage of the land occasioned by use of the portion appropriated, and does not include damage to the residue by reason of the use of adjoining lands." (Resp. Mot. Exclude at 6.) Defendants state that they "want to make it very clear from the outset that just because [Defendants] are not authorized to rely upon damages to the residue of their tract by reason of the use of adjoining lands of another, this does not mean [Defendants] are deprived of damages to the residue as a result of the taking of land upon their own tract." (Id. at 7.) Defendants also argue that the cases cited by Plaintiff are distinguishable from this action. (Id. at 7-9.) Defendants contend that "Mr. Penn did not fundamentally base his decreased value on the adjoining property at all," but instead "found decreased value due to the specific encroachment rights on the Subject Property that in his educated opinion would cause any prospective buyer to offer a lesser amount for the property." (Id. at 9.) Defendants argue "that it is substantially impossible to separate the easement rights taken upon the Subject Property from other similar easement rights that exist on the actual TVA transmission line easement, effectively rendering such rights on both of these adjoining tracts to be one and the same." (Id. at 9-10.)
Defendants also contend that Plaintiff has misrepresented the true nature of the tree removal rights at issue here. (Resp. Mot. Exclude at 10-14.) According to Defendants, Plaintiff actually took an easement. (Id. at 11.) Defendants complain that "[t]he indefinite language of the legal description, particularly the language by which the easement will encumber the entire residential lot, presents a legitimate concern to the appraiser on how to determine the reduction in value caused by these 'tree removal' rights, since the appraiser cannot fully know the extent of these rights." (Id. at 12.) Defendants further complain that "the appraisal problem itself is compounded by the fact that the easement rights on the Subject Property are substantially similar to the peripheral easement rights on the actual TVA transmission power line easement." (Id. ) According to Defendants, "TVA has done nothing more than attach a new label to the segment of the true power line easement that encumbers the Subject Property, in a disguised effort to avoid a similar taking on this adjoining property," and "TVA attempts to manipulate the system to avoid this taking." (Id. at 13.)
Defendants argue that Plaintiff misconstrued the factors upon which Mr. Penn relied to form his "after-take" valuation opinion. (Resp. Mot. Exclude at 14-18.) According to Defendants, "as to the comment that the tree-trim easement is excessive, the point is that, from the outset, a question is raised as to why this easement *1343 is even necessary in the first place." (Id. at 15.) Defendants argue that "TVA misconstrues this comment to be a primary factor in after-take valuation of the property, which it is not." (Id. ) Defendants raise the same argument with respect to the second factor. (Id. ) Defendants further contend that the third factor-the ability of potential buyers to distinguish between tree-removal rights and the easement for the power line is a real problem. (Id. at 15-16.) According to Defendants, "under the circumstances in this case, not even a well-trained real estate attorney could properly determine the parameters and limitations of this undefined easement," and "TVA once again misconstrues this comment to be a primary factor in the after-take valuation of the property, which it is not." (Id. at 16.) As for the unaccepted offer, Defendants argue that Mr. Penn did not use the offer to establish market value. (Id. at 16-17.) According to Defendants, "Mr. Penn considered this information, not as a comparable sale, but merely as one more bit of information to confirm his paired-data analysis." (Id. at 17.) Next, Defendants take issue with the attack on Mr. Penn's paired value analysis. (Id. ) Defendants contend that: "Mr. Penn's report was not based upon the effect of the adjoining TVA power line on the Subject Property. Instead, Mr. Penn's focus was upon the rights taken on the Subject Property , and what a prospective buyer would likely pay for this property after the taking." (Id. at 18 (emphasis in original).)
Defendants contend that Mr. Penn is qualified to offer the opinion at issue. (Resp. Mot. Exclude at 22.) According to Defendants, the opinion is relevant because it "provide[s] some basis for the jury to determine the after-take value of the Subject Property." (Id. ) With respect to reliability, Defendants contend that Mr. Penn's methodology is sound, that Mr. Penn could not locate relevant rights in Gordon County for tree removal, and that Plaintiff has ignored much of Mr. Penn's studies, reports, articles, and related information. (Id. at 23-25.)
3. Plaintiff's Reply
In its reply, Plaintiff notes that "Defendants' argument, at its core, is that the tree clearing rights that encumber the subject property should be merged into and considered to be part of the transmission line easement encumbering the adjoining Veach property." (Reply Supp. Mot. Exclude (Docket Entry No. 48) at 2.) Plaintiff states that, under this view, "the subject property would be valued as if [Plaintiff] had acquired the right to erect a transmission tower and run transmission lines across it," and observes that "Defendants cite absolutely no legal authority in support of this novel interpretation of property law." (Id. ) Plaintiff points out that the Court held in a similar case that the tree clearing rights described in the declaration of taking sufficiently informed the landowner of the property rights acquired. (Id. at 2-4.) According to Plaintiff, "just as the challenged Declaration of Taking sufficiently informed the parties of the property rights acquired in this condemnation, the same description, recorded with the Superior Clerk for Gordon County, Georgia, will inform any potential buyer of the subject property of the nature and extent of the tree removal rights acquired by [Plaintiff]." (Id. at 5-6.) Plaintiff further points out that the property rights that it acquired to construct and maintain a transmission line on the adjacent Veach property are separate and distinct from the rights that it acquired to remove trees on the subject property. (Id. at 6-7.) According to Plaintiff: "Taken to its logical extreme, Defendants' suggestion that the property rights acquired for both properties should be merged would mean that [Plaintiff] would have to compensate Defendants for the right to build and maintain *1344 a transmission line on the [S]ubject [P]roperty and for restrictions on [Defendants'] use of the [S]ubject [P]roperty that it did not acquire." (Id. at 7.)
Plaintiff also argues that Mr. Penn's opinion concerning after-take value is not based on a generally accepted methodology for appraising tree clearing rights. (Reply Supp. Mot. Exclude at 8-12.) Plaintiff notes that, although Defendants contend that Mr. Penn did not consider some of the factors as primary factors in forming his opinion, "Defendants have proffered no affidavit, deposition errata, or supplemental report certified by Mr. Penn that even attempts to qualify his earlier testimony." (Id. at 8.) Plaintiff also contends that Mr. Penn improperly used a trend analysis, noting: (1) "Defendants proffer no testimony or affidavit from Mr. Penn stating that there was no sales data in Gordon County involving tree clearing rights" (id. at 11); (2) "the trend analysis relied upon by Mr. Penn involves sales in Henry County and is not an analysis of sales in Gordon County" (id. ); and (3) "Mr. Penn made no adjustments in his trend analysis to account for the absence of a transmission line easement on the subject property" (id. ). Plaintiff further contends that "even assuming that Mr. Penn's market studies can be characterized as 'paired data analysis,' it was improper for Mr. Penn to rely on market studies involving properties having materially different characteristics (property physically encumbered by transmission lines)." (Id. at 12.) Plaintiff points out that the voluminous studies attached to Mr. Penn's report do not warrant a different result. (Id. at 12-13.) According to Plaintiff:
[N]either Mr. Penn nor Defendants cite any legal authority or methodology generally accepted within the appraisal profession that would allow Mr. Penn to value tree clearing rights using studies of properties having transmission lines on them. The consequence of allowing Mr. Penn to render an opinion using this methodology would allow Defendants to offer evidence in support of a damages claim arising from the presence of a power line on an adjoining property.
(Id. at 13.)
B. Applicable Standard
"Under Federal Rule of Evidence 702, expert testimony is admissible if (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is sufficiently reliable as determined by the sort of inquiry mandated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1304 (11th Cir. 2014) (internal quotation marks and citation omitted). The United States Court of Appeals for the Eleventh Circuit has noted that a court may admit expert testimony if it meets three requirements: (1) the expert is "qualified to testify competently regarding the matter he or she intends to address"; (2) the methodology used is reliable, as determined by a Daubert inquiry; and (3) the testimony assists "the trier of fact through the application of expertise to understand the evidence or determine a fact in issue." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010). Although "there is inevitably some overlap among the basic requirements-qualification, reliability, and helpfulness-they remain distinct concepts and the courts must take care not to conflate them." Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks and citation omitted). "[T]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." Chapman, 766 F.3d at 1304 (internal *1345 quotation marks and citation omitted); see also Kilpatrick, 613 F.3d at 1335 ("[T]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." (internal quotation marks and citation omitted)). With respect to the first requirement, qualification, a witness must be able to testify competently regarding the matters that he or she intends to address by virtue of his or her education, training, experience, knowledge, or skill. United States v. Frazier, 387 F.3d 1244, 1260-61 (11th Cir. 2004). Although "an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability." Id. at 1261 (internal quotation marks and citation omitted). Indeed, "one may be considered an expert but still offer unreliable testimony." Id. (internal quotation marks and citation omitted).
With respect to the second factor, reliability, the Court performs a "gatekeeping function." Chapman, 766 F.3d at 1304 (internal quotation marks and citation omitted). In Daubert, the Supreme Court identified four factors for courts to consider in determining whether proffered expert testimony is reliable:
(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community.
United Fire & Cas. Co. v. Whirlpool Corp., 704 F.3d 1338, 1341 (11th Cir. 2013) (per curiam) (citing Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786 ). Those factors, however, "are not a definitive checklist or test," and the Court must apply those considerations "in case-specific evidentiary circumstances." Chapman, 766 F.3d at 1305 (internal quotation marks and citation omitted).
Although the Daubert inquiry is flexible, the Court's "focus [when assessing reliability] 'must be solely on principles and methodology, not on the conclusions that they generate.' " Chapman, 766 F.3d at 1305 (emphasis omitted) (quoting Daubert, 509 U.S. at 594-95, 113 S.Ct. 2786 ). Conclusions and methodology, however, "are not entirely distinct from one another," and "neither Daubert nor Federal Rule of Evidence 702 requires a trial judge to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Id. (internal quotation marks and citation omitted).
The third factor, relevancy, requires the Court to ensure that the expert's testimony "is relevant to the task at hand." Chapman, 766 F.3d at 1306 (internal quotation marks and citation omitted); see also United States v. Ala. Power Co., 730 F.3d 1278, 1282 (11th Cir. 2013) ("In evaluating the reliability of scientific expert testimony, a district court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue." (internal quotation marks and citation omitted)). Under this factor, the Court may exclude even reliable expert testimony if no logical relationship exists between the testimony and a fact or issue in the case. See Daubert, 509 U.S. at 591, 113 S.Ct. 2786 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); United States v. Wilk, 572 F.3d 1229, 1235 (11th Cir. 2009) (finding no error in district court's exclusion of irrelevant expert testimony);
*1346 Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1322-23 (11th Cir. 2003) (concluding that district court did not abuse discretion by excluding expert testimony that was not relevant).
Finally, the United States Court of Appeals for the Eleventh Circuit has cautioned that "the gatekeeping function under Rule 702 is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1334 (11th Cir. 2014) (per curiam) (internal quotation marks and citation omitted). Indeed, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Rosenfeld, 654 F.3d at 1193 (internal quotation marks and citation omitted). Rather, "in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." Id. (internal quotation marks and citation omitted).
C. Application
Importantly, it is Defendants' burden to show, by a preponderance of the evidence, that Mr. Penn's opinion concerning after-take value is reliable or admissible. Chapman, 766 F.3d at 1304 ; Kilpatrick, 613 F.3d at 1335. The Court finds that Defendants have failed to satisfy this burden.
Defendants' argument concerning the alleged deficiency of the description of the rights taken fails for the same reasons as set forth in United States ex el. Tenn. Valley Auth. v. Tree-Removal Rights with Respect to Land in Gordon Cty., Ga., 249 F.Supp.3d 1315, 1319 (N.D. Ga. Apr. 12, 2017). Further, Defendants cite no legal authority to support their contention that the Subject Property should be valued as if Plaintiff had acquired the right to erect a transmission tower and run transmission lines across it. In any event, a comparison of the Declaration of Taking in this action to the Transmission Line Easement for the Veach Property demonstrates that the rights being taken for the respective rights-of-way and the restrictions on use of the properties are significantly different and are separate and distinct. Further, Defendants are, in essence, seeking to recover compensation for damage to adjoining property, which is clearly impermissible.
It is also clear from Mr. Penn's revised report and from his deposition testimony that Mr. Penn considered at least some improper factors when forming his opinion as to the after-take value of the subject property. Although Defendants now attempt to argue in their response that Mr. Penn did not consider those factors to be primary factors in forming his opinion, this argument is contrary to Mr. Penn's report itself and to his deposition testimony, and Mr. Penn has not supplemented or revised his report to indicate that those factors were not primary factors. Defendants' argument thus is not persuasive.
With respect to the first factor, Mr. Penn's opinion that the easement taken was "excessive," Mr. Penn stated that trees in Georgia normally would not grow tall enough within the right-of-way on the Subject Property to damage the transmission line on the Veach property. Plaintiff correctly points out that Mr. Penn is not an expert in forestry, vegetation management, or transmission line maintenance, and he is not qualified to offer this opinion. Further, Mr. Penn's consideration of this factor is not relevant to damages to be awarded in this condemnation action, which must be based on the change in value arising from the property rights actually *1347 taken, not the property rights that Mr. Penn believes Plaintiff should have taken.
The second factor, potential damage caused by a tower falling from the Veach property onto the Subject Property, is based on a speculative and hypothetical event. Further, this factor involves damages that are not recoverable in this federal condemnation action. See United States ex rel. Tenn. Valley Auth. v. An Easement and Right of Way 150 Feet Wide and 582.4 Feet Long Over Certain Land in De Kalb Cty., Tenn., 182 F.Supp. 899, 904 (M.D. Tenn. Feb. 24, 1960) ("The Commissioners are instructed that they are not to consider in this proceeding any torts which may have been committed in the past or might be committed in the future by the Government. Thus, if the Government's employees should leave the fences down and allow livestock to stray or should trespass beyond the limits of the right of way these would be separate torts for which the Government would be answerable in a separate suit, but not in this proceeding.").
The third factor, the assumption that the prospective buyers would be uninformed, is contrary to the definition of market value set forth in Mr. Penn's revised report and contrary to the definition of market value set forth in the Appraisal Standards for Federally Related Transactions, 12 C.F.R. § 225.62. Penn Revised Report at 6-7; see also 12 C.F.R. § 225.62(g) (noting that, implicit in the definition of market value "is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: ... [b]oth parties are well informed or well advised, and acting in what they consider their own best interests").
As for the fourth factor-an unaccepted offer made by a third party to Defendant Pamela Duckworth to purchase another piece of property-an unaccepted offer is not admissible to establish market value. See United States v. Smith, 355 F.2d 807, 811 (5th Cir. 1966) ("It is well settled that a mere offer, unaccepted, to buy or sell is inadmissible to establish market value.").[1] This factor is therefore an impermissible consideration.
The fifth factor, trend or paired data analysis, also is problematic because Mr. Penn used control properties that all were encumbered by transmission lines, and none of Mr. Penn's other studies examined a change in value associated only with tree-clearing rights. Mr. Penn does not appear to have adjusted his valuation to take into account the differences between a transmission line easement and a tree-clearing easement. This deficiency is not simply an issue that goes to the weight to be given to Mr. Penn's testimony or a credibility issue for the jury to determine-it goes to the heart of Mr. Penn's opinion and renders it unreliable. Moreover, although Mr. Penn has significant and impressive experience appraising property in state court, the studies attached to his report do not make his testimony admissible in federal court, as none of those studies appear to address properties encumbered solely by tree clearing rights.
The above concerns, especially when considered together, cause Mr. Penn's testimony concerning after-market value to be inadmissible under Rule 702. Importantly, Defendants bear the burden to show, by a preponderance of the evidence, that Mr. Penn's opinion testimony concerning *1348 after-market value is reliable and admissible. Defendants simply have not met their burden here, and the Court therefore grants the Motion to Exclude.
III. Conclusion
ACCORDINGLY, the Court GRANTS Plaintiff's Motion to Exclude [44], and EXCLUDES expert testimony by Bruce Penn concerning the after-take value of the Subject Property.
IT IS SO ORDERED, this the 20 th day of December, 2017.

Opinions of the United States Court of Appeals for the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).